UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PKF O'CONNOR DAVIES LLP,<br><br>                              Plaintiff,<br><br>          – against –<br><br>FRANK GIORDANO, III,<br><br>                              Defendant. | Civil Case No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff PKF O'Connor Davies LLP ("Plaintiff" or "PKF"), by and through its counsel, Yankwitt LLP, alleges the following as its Complaint against defendant Frank Giordano, III ("Giordano" or "Defendant"):

## NATURE OF THE ACTION

1.      This is an action against a shareholder and employee who stole trade secrets and other confidential and proprietary information from his former employer and used that information to poach its clients in violation of a binding and enforceable restrictive covenant.

2.      Plaintiff, a top-tier accounting, tax, and advisory practice with a long history of serving domestic and international clients, entered a business combination with Judelson, Giordano and Seigel, CPA, P.C. ("JGS"), effective January 1, 2022, whereby Plaintiff acquired certain business assets of JGS.

3.      On May 22, 2019, before its combination with Plaintiff, JGS entered into a Settlement, Waiver and Release Agreement (the "Agreement") with Giordano, who had been a shareholder in JGS until his employment was terminated on August 3, 2018 (the "Termination Date").

4.      As part of the business combination with JGS, Plaintiff assumed all JGS's rights and obligations under the Agreement.

1

5.     Prior to his termination, Giordano had been responsible for servicing some of JGS's largest clients, including the American Petroleum Equipment & Construction Co. ("APECO") and PLC Group ("PLC"), as well as JGS's legacy beer distributor accounts, including, but not limited to, D. Bertoline & Sons, Inc. ("D. Bertoline") and F&F Distributors, Inc. ("F&F").

6.     Giordano agreed to multiple restrictive covenants in the Agreement, including: (a) prohibiting Giordano from working for any of JGS's clients for five (5) years from the Termination Date; (b) prohibiting Giordano from acquiring any of JGS's clients for five (5) years from the Termination Date; (c) prohibiting Giordano from using JGS's confidential information in perpetuity; and (d) prohibiting Giordano from maintaining an office within a radius of ten (10) miles from any current office of JGS or its successor for three (3) years from the Termination Date.

7.     Although JGS diligently complied with the terms of the Agreement, it was not long before Giordano began violating them.  Indeed, Giordano's first known effort to poach one of JGS's clients occurred within months of the Termination Date.

8.     The frequency and flagrancy of Giordano's poaching efforts increased after he was hired by RBT, a major competitor of JGS and Plaintiff.

9.     Specifically, Giordano worked for and solicited JGS's clients in violation of the Agreement's restrictive covenants prohibiting Giordano from working for or soliciting JGS's clients within five (5) years of the Termination Date.

10.     Even worse, in the course of violating the Agreement's restrictive covenants by poaching JGS's clients, Giordano boasted to those clients that he had access to proprietary information that rendered him uniquely capable of providing accounting services to beer distributors, a niche market that JGS has spent many years cultivating.  This proprietary and confidential trade secret information is contained in a JGS-originated spreadsheet that now belongs

to Plaintiff (the "Spreadsheet").  Although Giordano had access to the information contained in the Spreadsheet while he was employed at JGS, he was not permitted to possess or use it for any purpose after the Termination Date.

11.     Based on Giordano's repeated flagrant violations of the Agreement's restrictions against working for and poaching JGS's clients, as well as his theft of JGS's trade secret information, on behalf of himself and RBT, Plaintiff has been forced to commence this action seeking injunctive relief; compensatory, exemplary, and punitive damages in an amount to be determined at trial; and attorneys' fees for Giordano's violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq.*; misappropriation of trade secrets under New York common law; breach of contract; unjust enrichment; tortious interference with prospective economic advantage; and slander *per se*.

## THE PARTIES

12.     Plaintiff is a limited liability partnership organized under the laws of New York, with its principal place of business at 500 Mamaroneck Avenue, Harrison, NY 10528.

13.     Giordano is an individual domiciled in New York.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it seeks to enforce rights and remedies secured under the DTSA.

15.     This Court has supplemental jurisdiction over the New York law claims in this action pursuant to 28 U.S.C. § 1367(a).

16.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this judicial district.

## FACTS

**Giordano Enters into the Agreement with JGS Following His Termination**

17.     Giordano was a partner and shareholder at JGS for approximately fifteen (15) years before his termination.  Between 2014 and 2018, Giordano acted as the company's administrative partner; however, he was stripped of this title a few months before the Termination Date after he flagrantly violated his fiduciary duties and obligations to JGS.

18.     In his role as administrative partner, Giordano was responsible for processing client payments and maintaining JGS's books and records.

19.     During his tenure at JGS, Giordano developed a sub-specialty in the beer/beverage distribution industry using skills he learned from his father—who previously served as the managing partner of JGS—and serviced many of Plaintiff's legacy beer distributor accounts.

20.     While he was employed at JGS, Giordano had access to all the files stored on JGS's server, including but not limited to the Spreadsheet, which contains proprietary and confidential trade secret information regarding Plaintiff's clients in the beer/beverage distribution industry.

21.     On or about August 3, 2018, Giordano's employment at JGS was terminated.

22.     For approximately ten (10) months following the Termination Date, JGS and Giordano negotiated the terms of his termination, which were ultimately memorialized in the Agreement.

23.     Pursuant to the Agreement, which was entered into on May 31, 2019, and made effective retroactively to the Termination Date, Giordano agreed: (a) not to work for JGS's existing clients whether directly or indirectly in any capacity, with or without compensation, for a period of five (5) years from the Termination Date; (b) not to acquire any of JGS's existing clients for a period of five (5) years from the Termination Date; (c) not to use JGS's confidential information

4

for any purpose in perpetuity[1]; and (d) not to work within a radius of ten (10) miles from any current office of JGS for three (3) years from the Termination Date.[2]

24.    The relevant provisions of the Agreement are as follows:

25.    Section 10.B of the Agreement states that "[f]or five (5) years from August 3, 2018 [Giordano] shall not Acquire[3] any 'Client.'"

26.    Pursuant to section 10.C.1 of the Agreement, "[f]or five (5) years from the [Termination] Date, [Giordano] shall not perform any 'Firm Business'[4] for any 'Client'[5] . . . whether directly or indirectly, in an individual or other capacity, and without regard to whether or not he receives compensation for such services."

27.    Section 10.D of the Agreement states that "[Giordano] shall not use 'Confidential Information'[6] in any way."

---

[1] Although the Agreement lists four (4) exceptions to the restrictions on Giordano's use of JGS's confidential information, none of them applies here.

[2] Although the Agreement provides an exception to the restriction on Giordano's ability to work within a radius of ten (10) miles from any current office of JGS, it does not apply here.

[3] As defined in Section 10.A.8 of the Agreement, "'Acquire' shall mean, whether done directly or indirectly (either as an individual or through any other capacity), to solicit, accept or provide services to a 'Client' . . . concerning 'Firm Business'."

[4] As defined in Section 10.A.1 of the Agreement, "'Firm Business' shall mean any services, whether billed or not billed, directly and/or indirectly rendered by any 'Firm Entities,' including by not limited to, any consulting, advisory or 'Brokerage Services.'"

[5] As defined in Section 10.A.4 of the Agreement, "'Client' shall mean any individual or entity . . . on whose behalf any of the 'Firm Entities' performed 'Firm Business' at any time between August 3, 2013 and August 3, 2018."

[6] As defined in Section 10.A.7.ii of the Agreement, 'Confidential Information' shall mean . . . [a]ny information provided to 'JGS' or any of the 'Firm Entities' whether oral or in writing in connection with 'Firm Business' provided by 'JGS' or any of the 'Firm Entities' to any 'Client', 'New Client' or 'Former Client' that is not in the public domain."

28.     Finally, pursuant to section 10.F of the Agreement, "[f]or a period of three (3) years from the [Termination] Date, [Giordano] shall not have, use, occupy or maintain an office within a radius of ten (10) miles from any current office of the 'Firm' or the 'Firm's' successor."

**Giordano Accepts Employment with PKF Clients in Violation of the Agreement**

29.     Shortly after Giordano was terminated by JGS, Giordano accepted the position of COO of APECO, which had been a client of JGS for approximately five (5) years.

30.     Giordano was terminated by APECO in early 2019.

31.     Upon information and belief, in or about December 2022, Giordano was hired by D. Bertoline, JGS's client for over twenty (20) years before it moved its business to RBT in or about August 2022.

32.     By working for APECO after the Termination Date and into early 2019 and by accepting a position with D. Bertoline in or about December 2022, Giordano violated the Agreement's restrictive covenant prohibiting him from working for any of JGS's clients within five (5) years of the Termination Date.

**Giordano Takes a Job with RBT in Violation of the Agreement**

33.     Upon information and belief, after his termination by APECO and in or before October 2019, Giordano began working at RBT.

34.     At the time Giordano began working for RBT, RBT maintained an office at 2678 South Road in Poughkeepsie, NY.

35.     RBT's Poughkeepsie office is located across the street from JGS's office located at 2645 South Road in Poughkeepsie, NY.

36.     By working for RBT on or before October 2019, Giordano violated the Agreement's restrictive covenant prohibiting him from maintaining an office within a radius of ten (10) miles from JGS's office within three (3) years of the Termination Date.

**RBT Learns That Giordano Is Subject to the Agreement**

37.     At or around the time Giordano began working at RBT, RBT was made aware that Giordano was subject to the restrictive covenants set forth in the Agreement.

38.     Specifically, on or about September 4, 2019, Jason Giordano ("Jason"), Domenick Del Rosso, and Robert Unger, partners at JGS (and now partners at PKF), learned from Mike Turtorro ("Turtorro"), Managing Partner at RBT, that Giordano was interested in attending a conference hosted by the National Beer Wholesalers Association ("NBWA") in October 2019.

39.     Jason informed Turtorro that Giordano did not have JGS's permission to attend.

40.     Jason further informed Turtorro that Giordano was subject to additional restrictions pursuant to the Agreement.

41.     On or about July 23, 2019, Brian Powers ("Powers"), an employee of JGS, learned from Tom Kennedy ("Kennedy"), a partner at RBT, that Kennedy had met with Giordano and that they had spoken about the beer distribution industry.

42.     Kennedy also informed Powers that Giordano had told him that Powers was interested in joining RBT, which was untrue.

43.     Upon information and belief, Giordano was working for RBT as recently as April 5, 2023, when Giordano attended a conference with Jonathan Rouis, a partner at RBT, and listed RBT as his employer.

**Giordano Lies About PKF in Order to Poach PKF's Clients in Violation of a Restrictive Covenant**

44.　　Shortly after Giordano was terminated by JGS, APECO, which had been a client of JGS for approximately five (5) years, moved its business to RBT.

45.　　On or about March 4, 2022, Gary Cassiello ("Cassiello"), a partner at PKF, learned that PLC, a JGS client for approximately four (4) years, had decided to move its business to RBT.

46.　　In or about August 2022, Rob Unger, a partner at PKF, learned that D. Bertoline, a beer/beverage distributor client of JGS and PKF for over twenty (20) years, had moved its business to RBT.

47.　　In or about April 18, 2023, Eric Filardi ("Filardi"), owner of F&F, a beer/beverage distributor client of JGS for over fifteen (15) years, informed Cassiello that Giordano had stated that Cassiello was retiring from PKF and that as a result, F&F had decided to move its business to RBT and Giordano in particular.

48.　　Giordano's statement regarding Cassiello was false; in fact, Cassiello is transitioning to an advisory role at PKF in which he will continue to provide accounting services to all his existing clients.

49.　　Cassiello assumed responsibility for many of the beer/beverage distributor clients that Giordano had serviced prior to his departure from JGS.

50.　　Giordano's statement falsely suggested to Filardi that Plaintiff offers inferior accounting services to its beer/beverage distributor clients.

51.　　Giordano's defamatory statement was published to third parties, was unprivileged, and has damaged Plaintiff's business reputation.

52.　　Moreover, by poaching PLC, D. Bertoline, APECO, and F&F from Plaintiff between the Termination Date and May 2023, Giordano violated the Agreement's restrictive

covenant prohibiting him from soliciting or providing services to any of JGS's clients within five (5) years after the Termination Date.

**Giordano Reveals That He Stole JGS's and PKF's Trade Secrets**

53.     Based on conversations with PKF's clients, PKF learned that Giordano has taken credit for creating a proprietary document during his tenure at JGS in an effort to poach PKF's clients.

54.     The proprietary document that Giordano was referring to could only have been the Spreadsheet, which Giordano's father principally created nearly twenty (20) years ago to assist JGS in servicing its beer distributor clients.  The Spreadsheet, which is Plaintiff's confidential and proprietary information, is essential to Plaintiff's business in the beer/beverage distribution space. It is a non-public document housed on JGS's and PKF's password-protected servers and constitutes a trade secret.

55.     Plaintiff's trade secrets, including the Spreadsheet, derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. Plaintiff's trade secrets give it a competitive advantage over other accounting firms that do not have access to its trade secret information.  Plaintiff's trade secrets are valuable and crucial to its business functions and competitive position as an accounting firm.

56.     The Spreadsheet is of enormous potential value to a competing accounting firm. For example, it would allow a competitor firm to replicate many of Plaintiff's accounting methods and practices.  As another example, it would give Giordano an unfair advantage in targeting Plaintiff's clients and trying to lure them away to a competing accounting firm.  The disclosure or use of Plaintiff's trade secret information by another accounting firm would risk destroying

Plaintiff's competitive edge.  Plaintiff has made efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets by, among other things, entering into the Agreement with Giordano to prohibit him from stealing Plaintiff's trade secrets and poaching its clients as a condition of his termination, and password-protecting the server containing the Spreadsheet.

57.     Because the Spreadsheet belongs to PKF, Giordano's possession of the Spreadsheet after the Termination Date constitutes theft of PKF's trade secrets.

58.     Upon information and belief, Giordano and RBT are using the Spreadsheet not only to solicit PKF's clients, but also to service clients Giordano poached from PKF and other clients as well, in violation of the Agreement, the DTSA, and New York common law prohibiting the misappropriation of trade secrets.

**COUNT I**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**18 U.S.C. §§ 1836, *ET SEQ.***

59.     Plaintiff repeats, re-alleges, and incorporates all prior allegations as if set forth fully herein.

60.     As set forth above, Plaintiff owns various trade secrets within the meaning of the DTSA, 18 U.S.C. § 1839(3), which are critical to the success of its business, including but not limited to the Spreadsheet.

61.     Plaintiff's trade secrets relate to the accounting services it provides in interstate commerce.

62.     As set forth above, Plaintiff's trade secrets give it a competitive advantage over other accounting firms that do not have access to its trade secret information.  The trade secrets that Giordano misappropriated are of enormous potential value to a competing accounting firm.

63.     Giordano's actions described herein constitute misappropriation of trade secrets within the meaning of DTSA, 18 U.S.C. § 1839(5).

64.     Upon information and belief, Giordano misappropriated Plaintiff's trade secrets by knowingly acquiring them through improper means, including but not limited to theft.  By wrongfully acquiring Plaintiff's trade secrets, Giordano violated the terms of the Agreement, which expressly prohibits him from using Plaintiff's confidential information in perpetuity.

65.     Upon information and belief, Giordano also misappropriated Plaintiff's trade secrets by using them without Plaintiff's consent.  Each time that Giordano used Plaintiff's trade secrets, he knew or had reason to know that his knowledge of that confidential information was derived from his use of improper means.

66.     Giordano's misappropriation of Plaintiff's trade secrets has harmed Plaintiff and, unless permanently restrained, will further damage Plaintiff in ways and to an extent that may not be proven with certainty, irreparably injuring Plaintiff and leaving it without an adequate remedy at law.

67.     Plaintiff is entitled to damages for actual losses caused by Giordano's misappropriation of its trade secrets, as well as damages for any unjust enrichment caused by Giordano's misappropriation that is not addressed in calculating Plaintiff's actual losses.  In the alternative, Plaintiff is entitled to a reasonable royalty for Giordano's misappropriation of its trade secrets.

68.     Giordano's misappropriation of Plaintiff's trade secrets was willful and malicious, entitling Plaintiff to attorneys' fees and exemplary damages.

69.     Permanent injunctive relief is necessary to prevent irreparable harm and further use of Plaintiff's trade secrets.

## COUNT II
## <u>MISAPPROPRIATION OF TRADE SECRETS UNDER NEW YORK COMMON LAW</u>

70.     Plaintiff repeats, re-alleges, and incorporates by reference all prior allegations as if set forth fully herein.

71.     As set forth above, Plaintiff owns proprietary and confidential information that is critical to the success of its business, including but not limited to the Spreadsheet, which constitutes a trade secret under New York law.

72.     As set forth above, Plaintiff's trade secrets give it a competitive advantage over other accounting firms that do not have access to its trade secret information.  The trade secrets that Giordano misappropriated are of enormous potential value to a competing accounting firm.

73.     Giordano used Plaintiff's trade secret information in violation of the Agreement and acquired it by improper means, including but not limited to theft.  It is a fair inference that Giordano used Plaintiff's trade secrets and his possession of that confidential information to enhance his perceived value to RBT, the competing accounting firm he joined, and to financially benefit RBT.

74.     Giordano's misappropriation of Plaintiff's trade secrets has harmed Plaintiff and, unless permanently restrained, will further damage Plaintiff in ways and to an extent that may not be proven with certainty, irreparably injuring Plaintiff and leaving it without an adequate remedy at law.  Plaintiff is therefore entitled to permanent injunctive relief to prevent such irreparable harm.

75.     To the extent that Plaintiff's losses are calculable, Plaintiff is entitled to damages resulting from Giordano's misappropriation of its trade secrets.

## COUNT III
## BREACH OF CONTRACT

76.     Plaintiff repeats, re-alleges, and incorporates by reference all prior allegations as if set forth fully herein.

77.     The Agreement constitutes a valid and enforceable contract between the Plaintiff and Giordano.

78.     The Agreement contains several restrictive covenants that prohibit Giordano from, *inter alia*: (a) working for any of JGS's existing clients for five (5) years from the Termination Date; (b) acquiring any of JGS's existing clients for five (5) years from the Termination Date; (c) using Plaintiff's confidential information in perpetuity; and (d) maintaining an office within a radius of ten (10) miles from any current office of JGS or its successor for three (3) years from the Termination Date.

79.     Plaintiff performed all obligations required of it under the Agreement.

80.     On multiple occasions since the Termination Date, Giordano has breached the Agreement by: (a) taking jobs at APECO and D. Bertoline, both former clients of JGS, within five (5) years of the Termination Date; (b) soliciting and/or acquiring Plaintiff's clients, including but not limited to APECO, PLC, D. Bertoline, and F&F, within five (5) years of the Termination Date; (c) using the Spreadsheet, which contains Plaintiff's proprietary and confidential trade secret information; and (c) working for RBT, which maintains an office within a radius of ten (10) miles from JGS's office in Poughkeepsie, NY.

81.     Giordano's breach has damaged Plaintiff.

82.     Accordingly, Plaintiff is entitled to damages to be determined at trial resulting from Giordano's breach of contract.

## COUNT IV
## <u>UNJUST ENRICHMENT</u>

83.     Plaintiff repeats, re-alleges, and incorporates by reference all prior allegations as if set forth fully herein.

84.     Giordano is liable to Plaintiff for unjust enrichment.

85.     Giordano derived a benefit at Plaintiff's expense by poaching Plaintiff's clients in violation of the Agreement.

86.     It is against equity and good conscience to permit Giordano to retain the benefits he derived from the clients he unlawfully poached from Plaintiff.

87.     Accordingly, Plaintiff is entitled to restitution from Giordano for the unjustly obtained benefits in an amount to be determined at trial.

## COUNT V
## <u>TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE</u>

88.     Plaintiff repeats, re-alleges, and incorporates by reference all prior allegations as if set forth fully herein.

89.     Giordano improperly used Plaintiff's proprietary and confidential trade secret information to induce Plaintiff's clients to terminate their business relationships with Plaintiff and hire RBT instead.

90.     APECO, PLC, D. Bertoline, and F&F terminated their business relationships with Plaintiff and moved their business to RBT.

91.     Upon information and belief, APECO, PLC, D. Bertoline, and F&F terminated their business relationships with Plaintiff as a result of Giordano's use of Plaintiff's proprietary and confidential trade secret information.

92.     By misappropriating Plaintiff's trade secrets and then using those secrets to poach Plaintiff's prospective business, Giordano interfered with Plaintiff's economic prospects by independently wrongful means.

93.     Accordingly, Plaintiff is entitled to damages to be determined at trial due to Giordano's tortious interference with Plaintiff's prospective economic advantage.

## COUNT VII
## SLANDER *PER SE*

94.     Plaintiff repeats, re-alleges, and incorporates by reference all prior allegations as if set forth fully herein.

95.     As set forth above, Giordano told the owner of F&F, one of Plaintiff's beer distributor clients, that Cassiello, who specializes in providing accounting services to beer distributors, is retiring, and suggested that Plaintiff would become incapable of handing its beer distributor clients because of Cassiello's departure.

96.     Giordano's statement is false.

97.     Giordano's statement suggests that Plaintiff offers inferior accounting services to its beer/beverage distributor clients.

98.     Giordano's defamatory statement was published to third parties, was unprivileged, and has damaged Plaintiff's business reputation.

99.     There is no reasonable justification or excuse for Giordano's false and defamatory statement.

100.    Giordano's false and defamatory statement therefore constitutes slander *per se*.

101.    Accordingly, Giordano is liable for damages to Plaintiff in an amount to be determined at trial, together with costs incurred herein, including reasonable attorneys' fees.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court:

I.     Enter a judgment that Giordano:

    a.   violated the DTSA;

    b.   misappropriated Plaintiff's trade secrets;

    c.   willfully and maliciously breached his duties under the Agreement with Plaintiff;

    d.   was unjustly enriched;

    e.   tortiously interfered with Plaintiff's prospective economic advantage; and

    f.   slandered Plaintiff.

II.    Enter a permanent injunction restraining Giordano and anyone acting in concert or participation with him from further misappropriation and use of Plaintiff's proprietary and confidential trade secret information and requiring Giordano to return to Plaintiff all such information (including all copies and excerpts thereof) that are in his possession, custody, or control, or are in the possession, custody, or control of anyone acting in concert or participation with Giordano.

III.   Award Plaintiff:

    a.   compensatory and other damages in amounts to be determined at trial;

    b.   liquidated damages under the Agreement;

    c.   exemplary damages;

    d.   disgorgement damages;

    e.   restitution;

    f.   attorneys' fees;

g.   costs of this litigation;

h.   prejudgment interest (where applicable); and

i.   such other legal and equitable relief as this Court deems just and proper.

Dated:  White Plains, New York
        June 12, 2023

                                    YANKWITT LLP

                                    _____
                                    Russell M. Yankwitt
                                    Corey M. Briskin
                                    Michael Reed

## JURY DEMAND

Pursuant to the provisions of Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all

issues so triable.